CROLEY *v.* BAKER.

5-3066                                          371 S. W. 2d 830

Opinion delivered November 4, 1963.

*J. E. Simpson,* for appellant.

*Lewis E. Epley* and *H. Paul Jackson,* for appellee.

ED. F. McFADDIN, Associate Justice. The appellees, Mr. and Mrs. Baker, on the claim of false representations, sought to rescind their purchase of realty, and also to recover damages, from the appellants, Mr. and Mrs. Croley. In the complaint and in the trial in the Chancery Court there were a number of claimed misrepresentations relating to a variety of matters; but the Chancellor found that all of the alleged misreprésentations had been waived except the one as to the water supply for the house; and on that basis, alone, rescission and damages were awarded. On this appeal the only question relates to the representations regarding the water supply for the house.

Mr. and Mrs. Croley owned a farm of 80 acres in Carroll County which they listed for sale with the Strout Realty Company. In the listing which the landowners

gave the said real estate broker there was this statement as regards the water situation for the house:[1] "Number of wells, one; Depth, 125 feet; Dug or drilled, drilled; Pumping equipment, electric pressure." The real estate broker advertised the property for sale, and the advertisement[2] said, as regards the water situation for the house: "Well for water; . . ." Mr. and Mrs. Baker lived in Texas; he is an electronics engineer and she is a writer of books for children. The Bakers saw the advertisement of the Croley property, and on November 22, 1960, the Bakers visited the Strout Realty Company office in Eureka Springs, and Mrs. Andrews-Porter, an agent of the Strout Realty Company, showed the Croley property to the Bakers. Here is Mrs. Baker's testimony as to what Mrs. Andrews-Porter said to her about the water for the house:

"Q. Did Mrs. Porter tell you there was plenty of water in the well, or did Mrs. Porter tell you what you testified this morning?

"A. She said to try it and we tried it and there was no reason to believe there wasn't.

"Q. You testified this morning you asked Mrs. Porter how much water was in the well and she said she didn't know but to try it?

"A. We tried it and there seemed to be plenty of water in the well.

"Q. All right. Then she didn't misrepresent that to you, did she?

"A. She didn't know—"

---

[1] As regards the water for the rest of the place, there was a spring for cattle, etc.; but that is not now before us. We confine the discussion entirely to the water supply for the house.

[2] The full advertisement showed a picture of the house on the land and said: "80 ACRES—$7900. 80 acres; half tillable and best for cattle, berries, 80 acres pasture to graze 20 head of cattle. Well for water; fencing and some cross-fencing for stock security. Nice variety of fruit trees for home use. Split-level home in excellent condition throughout; features 6 rooms, 3 bedrooms, bath, fireplace, hardwood flooring, porch, electricity and garage. View of town from large, shaded lawn with flowers and shrubs. Sheds. 5 mile drive to town with mail and milk routes passing. School bus near too. $2000 down makes this one yours. Full price, $7900. STROUT, Eureka Springs, Ark."

Miss Barbara Hussey accompanied the Bakers on their inspection of the Croley house; and she testified as to what was said about the water situation in the house:

"Q. . . . What inspection did they make concerning the water pump, related equipment?

"A. Mr. Baker asked her about the water supply, and where the water supply might come from and she took us outside the porch to a little shelter and I don't know whether there was a lock on it, I don't recall, however, the roof was raised on it, and the pressure system was shown to Mr. and Mrs. Baker and myself, and consisted of a pump set in concrete, as she said must be over the well; and there was a small pressure tank, related hoses leading to it. And she also pointed out the large spring holding tank up just from the house. I don't recall whether she pointed it out. I know we went up and looked at it later on. Mr. Baker looked for some time at the pump, and asked about it. He turned the switch on. We tried the facilities in the house. There was water."

And on cross-examination Miss Hussey stated:

"Q. Now, as to the—as to the water supply, did she go any farther beyond the fact that she said when she was asked if there was plenty of water she said that she didn't know, you would have to try it and see?

"A. That's as far as she went."

Mrs. Andrews-Porter, the agent for the Strout Realty Company, testified as to the inquiry and representations regarding the water situation for the house:

"Q. Did they ask you at that time anything about the water on the property?

"A. Specifically what water?

"Q. The well water.

"A. The well.

"Q. The water that was used in the house?

"A. They asked about the well, and I said the well was pure, as far as I know, it's all right. We went in and they turned on the spigot and water ran out. They flushèd the stool and they seemed to be well pleased with the way it operated and that was all that was said about it."

Mr. Baker did not testify in the case; and the testimony of Mrs. Baker, Miss Hussey, and Mrs. Andrews-Porter, as above copied, together with the said listing and advertisement, constitute the entire representations concerning the water situation for the house. It was shown that the Bakers moved into the house on May 29, 1961; that the water supply in the house first became inadequate on June 28th; that work was done on the well then and again on July 25th; that the well "went dry" some thirteen times between June and October; that an engineer, Mr. Roy Downs, tested the well and said it would produce only 11.4 gallons per hour or 273.6 gallons for 24 hours. Mr. Downs, called as a witness by appellees, testified:

"A. The average amount used for a family of 4 would be somewhere around 250 or 300 gallons.

"Q. In a 24 hour period?

"A. In a 24 hour period.

"Q. If that is true, Mr. Downs, . . . and this well produced 11.4 gallons per hour, would not that yield, in 24 hours period 273.6 gallons? . . .

"A. Yes."

Another witness, John Hadden, called by the appellees, testified:

"Q. John, you don't know how deep that well is, do you?

"A. No, sir, I sure don't.

"Q. And you don't know how far off the bottom of that well that jet is?

"A. That's what I said, Mr. Simpson, what McKinney reported back to me.

"Q. That's all you know is what somebody else reported?

"A. That's all I know."

We have given the evidence in some detail to demonstrate that *there is no testimony that the well was other than as represented.* Wherein was there a false representation as regards the water situation in the house? We fail to find any; and there must be a false representation in order to support a decree for rescission. In *Hunt v. Davis,* 98 Ark. 44, 135 S. W. 458, Mr. Justice Frauenthal stated the burden resting on one who sought a rescission of a contract on the claim of false representations:

"In order to charge the seller with fraud, it must be shown that he has made an active attempt to deceive the buyer relative to some matter material to the contract, either by statements which he knows to be false or by acts, conduct or representations which suppress the truth and induce in the buyer a false impression. Representations which are considered fraudulent in law must be of a nature that are material to the contract, and 'must be made by one who either knows them to be false or else, not knowing, asserts them to be true, and made with the intent to have the other party act upon them to his injury, and such must be their effect.' *Louisiana Molasses Co., Ltd. v. Fort Smith Gro. Co.,* 73 Ark. 542. If a representation is made by the seller which he knows to be false, it will constitute fraud, but a representation will also be fraudulent, even if he had no knowledge whatever, if it is made of a matter as truth of personal knowledge."

To the same effect, see *Whaley v. Niven,* 175 Ark. 839, 1 S. W. 2d 3; and *Fausett v. Bullard,* 217 Ark. 176, 229 S. W. 2d 490.

We have several recent cases involving rescission of a contract because of inadequate water. We discuss these to point out the differentiation in the factual situations between the adjudicated cases and the case at bar. In *Massey v. Tyra,* 217 Ark. 970, 234 S. W. 2d 759, we allowed rescission for misrepresentation of the water

supply for a house; but in that case there were definite misrepresentations, for the opinion recites:

"This was what Tyra was looking for, but before closing the deal he asked specifically about the water and made it clear that he would not purchase unless the water supply was sufficient for stock raising as well as for the home and restaurant. Wheeler told him there were two good springs on the land, suitable for watering stock, and that the 358-foot well near the house produced an ample water supply."

In *Clay* v. *Brand,* 236 Ark. 236, 365 S. W. 2d 256, recission was awarded for misrepresentation about the water supply; and here is what the opinion recites:

"The appellee, Mrs. Brand, testified that the appellant, Mrs. Clay, told her when she inspected the tourist court there was 'plenty of water here' and that Mrs. Clay brought the matter up several times; that Mrs. Clay assured her there was an adequate water supply for the needs of the house, the court, and the beauty shop."

In *Blythe* v. *Coney,* 228 Ark. 824, 310 S. W. 2d 485, a new house was sold in a section of the city wherein it later developed that there was, and would be for the foreseeable future, an entirely insufficient supply of water from the city water mains. The opinion gives these facts:

"In September, appellants checked with the city water department and were informed that they could not expect any change in the water supply in the near future. There is persuasive evidence that after Mr. Coney and Mr. Woodall were advised of the information obtained at the city water department, appellants were led to believe that Mr. Coney and Mr. Woodall would get them another house with a sufficient supply of water. After the parties failed to get together on a settlement, this suit was filed by appellants to set aside the contract of purchase."

We granted rescission, saying:

"We think the assumption of the parties in this instance that there was a sufficient water supply to the

house constituted a mutual mistake of a material fact under the circumstances, and appellants have the right to rescind the contract."

The facts in all of the cited and discussed cases are at great variance from those in the case at bar: because, here, there was no misrepresentation of the water situation of the house, there was no concealment; there was no evasion; and it was never shown that the appellants had experienced any trouble with the water supply. The appellees failed to make sufficient inquiry. The Chancery decree awarding rescission and damages, is reversed and the cause remanded, with directions to dismiss the complaint of the plaintiffs.